UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
BHUTAN INTERNATIONAL FESTIVAL, LIMITED;
BHUTAN DRAGON EVENTS AND FESTIVALS,
LIMITED,

                            Plaintiff(s),

       -against-

EDEN PROJECT; EDEN PROJECT LIMITED; EDEN
LAB; AND EDENLAB LTD.,

                            Defendant(s).
------------------------------------------------------------------------X

**PLAINTIFFS'
FIRST AMENDED
COMPLAINT AND
DEMAND FOR
JURY TRIAL**

Plaintiffs, Bhutan International Festival, Limited and Bhutan Dragon Events and Festivals, Limited, by and through their undersigned counsel, as and for their First Amended Complaint and Demand for Jury Trial in this action, set forth as follows:

## SUMMARY OF ACTION

1. Plaintiffs, through their principal, James Fitzgerald ("Fitzgerald"), are the founders and owners of the First Ever Annual Bhutan International Festival (the "Festival"). By virtue of his long record of work and activities in Bhutan, including the establishment of a rice exporting company and a premium spirits ~~importing~~ exporting business, Fitzgerald had secured the rights to the Festival, including a commitment from Bhutan's Queen Gyaltsuen Jetsun Pema Wangchuck to serve as Patroness, secured with the assistance of the Bhutanese festival partner, Thinley Palden Dorji. In October 2014, Fitzgerald, having been introduced to representatives of the Eden defendants (collectively "Eden"), partnered with Eden to produce and promote the Festival. Eden declared itself plaintiffs' Festival partner and, through its assigned event producers, proceeded to engage

1

and hire numerous artists, entertainers, and exhibitors to participate in the Festival -- contrary to its assurances, however, Eden failed to leverage its brand and connections to raise funds for the endeavor and contributed no money whatsoever -- Eden then represented to all concerned that *Fitzgerald* was responsible for their remuneration. Eden repeated these misrepresentations to high-ranking government officials in Bhutan, poisoning the relationships Fitzgerald had taken over eight years to build.

2.	Eden's actions: (i) forced Fitzgerald to cover most of the expenses Eden had incurred, funds he was forced to raise on an emergency basis by draining his life savings, drawing upon credit cards and insurance policies, and taking out loans from friends and family members; (ii) caused the ruination of what was to be an annual event; and (iii) destroyed Fitzgerald's good name, reputation, and the entirety of his business interests in Bhutan and nearly drove him bankrupt. This action is brought to provide just recompense for this wrongdoing.

## PARTIES

3.	Plaintiff Bhutan International Festival, Limited, is a corporation organized and existing under and by virtue of the laws of the State of New York.

4.	Plaintiff Bhutan Dragon Events and Festivals, Limited is a corporation organized and existing under and by virtue of the laws of the State of New York.

5.	Defendants Eden Project a/k/a Eden Project Limited ("Eden") is, upon information and belief, a limited liability company organized and existing under and by virtue of the laws of the United Kingdom.

6. Defendants Eden Lab a/k/a Eden Lab Limited ("Eden Lab") is, upon information and belief, a registered company organized and existing under and by virtue of the laws of the United Kingdom.

## JURISDICTION AND VENUE

7. Jurisdiction in this Court is invoked pursuant to 28 U.S.C. 1332 in that all plaintiffs and all defendants are citizens of different states and/or nations, and the amount in controversy exceeds $75,000.00.

8. Venue is proper in this district pursuant to 28 U.S.C. 1391(1) and 1391(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

9. Fitzgerald had successfully spent considerable time and capital working to promote various commercial interests in Bhutan over a period of a decade.

10. Fitzgerald as the principal of the Festival, hired Eden in ~~October~~ December 2014 to produce, promote, and act as festival partner.

11. He anticipated that the Festival, with Eden as a partner, as well as a commitment from the Queen of Bhutan to act as Royal Patron, would help further his commercial and personal interests in Bhutan.

12. On December 14, 2014, John Hendicott ("Hendicott") provided written terms of engagement to Fitzgerald via an email titled "EdenLAB Milestone and Fee Schedule" which served as the "initial terms of agreement."

13. On December 23, 2014, Eden followed up with an invoice for a requested payment of £10,000 to cover the "1st stage payment for programme development and management."

14. In performance of the Agreement and in order for Eden to commence the services, Fitzgerald wired the requested funds to Eden.

15. The Agreement further provided that, by December 30, 2014, there must be "[p]roof of at least 100k in working capital (for overall festival) to begin work in Bhutan January, 2015." Additionally, the Agreement stated that "75% of total budget must be raised by Jan 15, 2015 or EdenLAB will have to cancel their artists and pull EP and EL involvement and association."

16. Eden's management monitored the financial process by requiring that "[f]inal creative program [be] submitted to Peter Hampel and Tim Smit [Eden's Vice Chairman] for approval before Eden Project brand association can be publicized or used to leverage funding."

17. These provisions were supposed to ensure that Eden would discontinue its activities in connection with the Festival if the needed funding was not in place by January 15, 2016.

**Eden's Budget Grossly Exceeded Funding**

18. Eden emailed a budget on December 12, 2014, that provided for a total Festival outlay of $175,000; in the end, however, the Festival cost over $400,000.00.

19. Following receipt of the budget, Fitzgerald insisted to Eden on multiple occasions, both verbally and in writing, that he could only provide funding of $100,000.00 and that the Festival budget must be reliant upon outside fundraising above

4

his promised contribution (which he anticipated being repaid from assistance and support by virtue of Eden's brand, as well as from future festivals).

20. He reminded Hendicott and Ms. Virginia "Ginny" Galloway ("Galloway") continuously (both verbally and by email) that the Festival had to remain "beautiful and doable," within parameters of the available funding.

21. However, despite that Eden's own stated conditions had not been met that: (i) 100,000.00 in working capital had to be on hand by December 23, 2014 and (ii) 75% of the total Festival Budget had to be raised by January 15, 2015, Eden's staff nevertheless proceeded to plan the Festival and engage artists and incur charges with vendors and other third parties that far exceeded the $100,000.00 Fitzgerald had agreed to contribute.

22. Fitzgerald pleaded in several emails that they had run out of time to raise the funds Eden budgeted for the event and that Eden's plan for the size of the event had to be cut.

23. Ginny Galloway replied that she had a history of success in raising funds and was confident that the funds would materialize for the grand event that they were producing.

24. Despite Fitzgerald's repeated concerns about the lack of funding, Eden's staffs pushed full-steam ahead to engage artists, book flights, and arrange other travel accommodations for the Festival.

25. In the end, the amounts that Eden incurred were significantly higher, by well over $230,000.00, than the amount Fitzgerald agreed to personally cover.

**The Harm to Mr. Fitzgerald**

26.     As a direct result of Eden's event producers' false statements and the debts it incurred in Fitzgerald's name, all of his business interests in Bhutan have been entirely ruined.

27.     For example, the Festival was to be a springboard to further Fitzgerald's commercial interests in Bhutan, on top of the already existing annual TEDx event, the annual international marathon which Fitzgerald helped start in 2011, the production of a documentary film titled *"Crossing Bhutan"* which premiered at the Santa Barbara International Film Festival wherein Fitzgerald was credited as an Associate Producer, a travel and tourism company, and the aforementioned rice and spirits import business that Fitzgerald expended significant sums to cultivate and build over nearly a decade.

28.     Eden, however, despite having directly engaged the artists and performers and incurring travel and other third party costs knowing the costs exceeded the available funding, falsely advised the Festival's creditors that Fitzgerald was liable for their outstanding payments and further defamed him in subsequent emails.

29.     In that connection, on March 24, 2015, Hendicott, sent an email to the artists to whom the Festival was indebted advising them that there was a shortfall and that they could not be paid, and that Fitzgerald was solely at fault for this.

30.     As a result of this and other communications, Fitzgerald's developing relationships with crucial and influential people in Bhutan, including the Prime Minister and the King and Queen of Bhutan, which took years to cultivate, were forever ruined.

31.     Moreover, Fitzgerald reasonably expected that he would recoup his significant investment as the Founder and Chairman of future festivals. However, as a

result of Eden's statements, he has been prevented from organizing future annual versions of the Festival and this has resulted in a complete inability on his part to recoup his now extensive losses.

32. Indeed, Eden even attempted to usurp the Festival entirely.  As well as Fitzgerald's intellectual property rights related to the Festival's Facebook page (which Fitzgerald had created and had spent considerable sums promoting, receiving over 9,000 Facebook "likes"), when Galloway and Hendicott (to whom Fitzgerald had provided the administrator password) made themselves administrator and deleted Fitzgerald from all access.

33. Eden's event producers then proceeded to attempt to plan a Year Two Festival in Bhutan for March 2016.  They engaged Fitzgerald in such discussions on how Eden would take over but he would remain chairman.  Eden then decided not to work at all with Fitzgerald usurping Fitzgerald's status as Founder and Chair of the event that he had created and had engaged Eden to produce.

## ADDITIONAL JURISDICTIONAL FACTS

34. Plaintiffs filed their original complaint in this Court on November 16, 2017 (Document 1).

35. On February 23, 2018, defendant Eden filed a motion to dismiss for lack of jurisdiction (Document 16), based primarily upon the assertion that said defendant lacked a jurisdictional nexus to the forum state in this diversity action.

36. Plaintiffs' dealings were through the aforementioned individuals, Hendicott and Galloway, employees of defendant Eden Lab.

37. The dealings with these individuals included hundreds, if not thousands, of email and telephone communications into and out of New York, all pertaining to the Festival and relating to the claims made herein.

38. Said individuals solicited plaintiffs' funds within New York.

39. Said individuals received plaintiffs' funds sent from New York from plaintiffs' New York bank.

40. The aforementioned "Milestone" document provided to plaintiffs expressly set forth Eden's chairman's involvement as well as Eden's "brand association."

41. Said document's subtitle is: "Deadlines must be met in order for Eden Project and EdenLAB to move forward."

42. The document further states:

- Terms of Agreement or Eden Project and Eden Lab definition and roles and responsibilities for Ginny, John and any Eden Lab staff

    - and -

- Thursday, January 15th, 2015

    o 75% of total budget must be raised or EdenLAB will have to cancel their artists and pull Eden Project and EdenLAB involvement and association.

43. Statements to the press re-inforced the connection between Eden Lab and Eden Project as demonstrated by the headline and the lead paragraph in the *Bhutan Times* of January 25, 2015:

> Eden Project Makes Foray into Bhutan
>
> After an impressive run for 14 years in the United Kingdom

>(UK), Eden Project, the famous environmental education, attraction from the UK, is for the first time making a foray into Bhutan, landing as Edenlab.

44. The "Linked-in" website page for Peter Hampel notes that he served as "Creative Director" for Eden Project for fourteen (14) years before assuming the same title at Eden Lab in August 2012 -- his page describes the relationship as follows:

>In 2012 he founded EdenLab, a new creative production studio and design and sustainability consultancy. EdenLAB is Eden Project's international creative partner and contributes headline creative programmes to Eden Project as well as to a select group of international partners.

45. Other statements in the press also referred to Eden Lab as "Eden Project international creative partner" (*e.g.*, *Cornwall Live*).

46. The Eden Lab email signature "logo" in the aforementioned extensive electronic communications into New York stated: "Eden Project International Creative Partner."

47. The use of the identical names "Eden" in both entities was alone sufficient, in plaintiffs' analysis, to render such connection reasonable.

48. Eden Lab presented itself to plaintiffs as an extension of Eden Project and Eden Lab otherwise would have been an unknown entity as it had only done limited work and projects in the UK while Eden Project was world renowned for its ecological theme park in the UK.

49. It was Eden Project that was attractive to plaintiffs because Eden Project's brand and reputation would be leveraged to help raise funds for the Festival -- "Eden Lab" would have no fundraising leverage if it had no connection or relationship to Eden Project.

51. Under the circumstances presented here, Eden Lab is either the same as Eden Project or an alter-ego thereof, or in an agent-principal relationship.

52. At the very least, Eden Project clothed Eden Lab with apparent authority so as to estop the denial of any relationship between the two entities.

### FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

53. Plaintiffs repeat and reallege each of the above paragraphs as if set forth at length herein.

54. Plaintiffs, as co-adventurers with the Eden defendants in the promotion and production of the Festival, were owed fiduciary duties requiring Eden to exercise its duties and responsibilities with scrupulous good faith.

55. The Eden defendants, by their numerous acts of disloyalty, oppression, and self-dealing detailed above, breached their fiduciary duties owed to plaintiffs.

56. As a result of these breaches of fiduciary duties and acts of disloyalty, oppression, and self-dealing as set forth above, plaintiffs have incurred damages in an amount to be determined at trial but believed to be in excess of $1 million.

### SECOND CLAIM FOR RELIEF
### (Breach of the Joint Venture Agreement)

57. Plaintiffs repeat and reallege each of the above paragraphs as if set forth at length herein.

58. As set forth above, in and around December 2014, plaintiffs and defendants entered into a partnership/joint venture in connection with the promotion and production of the Festival.

59. By their actions as aforesaid, defendants breached their obligations and responsibilities owed to plaintiffs under and pursuant to the parties' agreement and as imposed by law.

60. As a result of the aforesaid breaches, plaintiffs have been damaged in an amount to be determined at trial but believed to be in excess of $1 million.

## THIRD CLAIM FOR RELIEF
### (For an Accounting)

61. Plaintiffs repeat and reallege each of the above paragraphs as if set forth at length herein.

62. On account of the various and tortious acts and contractual and fiduciary breaches described above, plaintiffs are entitled to an accounting, upon such terms and conditions as the Court, in its discretion, may find appropriate, and to be paid all damages caused by the aforesaid conduct.

63. Plaintiffs have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference)

64. Plaintiffs repeat and reallege each of the above paragraphs as if set forth at length herein.

65. During the times relevant herein, defendants were aware of plaintiffs' and Fitzgerald's existing and prospective contractual and business arrangements in the Nation of Bhutan.[1]

66. By their actions as aforesaid, defendants intended to destroy and/or harm plaintiffs' and Fitzgerald's existing contractual relationships and prospective business advantages.

67. Defendants used wrongful means to inflict the foregoing harms, including, but not limited to, defamation, libel and slander, false light, and misrepresentation.

68. Plaintiffs were damaged by defendants' conduct in that plaintiffs' contractual arrangements and prospective business advantages were destroyed, the amount of said damages to be determined at trial but believed to be in excess of $1 million.

## JURY DEMAND

69. Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

---

[1] *See, e.g.*, www.BHIF.org; http://DreamsofBhutan.com; http://SpiritsofBhutan.com; http://CrossingBhutan.com; http://BhutanInternationalMarathon.com

**WHEREFORE**, plaintiffs respectfully request that judgment be entered on all Claims for Relief as prayed for herein, that plaintiffs be awarded their costs and disbursements, including attorney's fees, together with such other and further relief as to the Court seems just and proper.

Dated: Syosset, New York
~~November 16, 2017~~
March 30, 2018

                                        **BAILEY LAW, P.C.**
                                        *Attorneys for Plaintiffs*

By: _____
     Edward G. Bailey (EB-9954)
485 Underhill Boulevard, Suite 308
Syosset, NY 11791
(516) 864-2100